B. E. Mills v. Commissioner. B. E. Mills and Zora Mills v. Commissioner.
Mills v. Commissioner
Docket Nos. 44282, 44283.
United States Tax Court
T.C. Memo 1957-157; 1957 Tax Ct. Memo LEXIS 93; 16 T.C.M. (CCH) 642; T.C.M. (RIA) 57157; August 9, 1957
*93 Held: (1) That there are no deficiencies in tax or additions to tax with respect to Zora Mills. (2) That there are no deficiencies in tax or additions to tax arising out of the proceeding in Docket No. 44282. (3) That respondent, with respect to the years 1941 and 1942, has failed to meet the burden of proving fraud, and that assessment and collection are barred by limitations as to said years. (4) That section 6 of the Current Tax Payment Act of 1943 is applicable to B. E. Mills. Understatement for the year 1942 is determined as a basis for application of section 6 of said Act in determining deficiency for the year 1943. Held further that the resulting additional deficiency is not barred by the statute of limitations. (5) That the use of the net worth and expenditures method as evidence of understatements for the years in question was proper. (6) That respondent has satisfied the burden of proving that some part of the deficiency of B. E. Mills for each of the years 1943 to 1946, inclusive, was due to fraud with intent to evade taxes. Understatements determined for the years 1943 to 1946, inclusive, as to B. E. Mills in Docket No. 44283. Claim of overpayment of income *94 taxes subsequent to filing of petitions to this Court to be considered under Rule 50. Dewey R. Roark, Jr., Esq., Scott P. Crampton, Esq., for the petitioners. Herman Wolff, Jr., Esq., for the respondent. FISHER
Memorandum Findings of Fact and Opinion FISHER, Judge: Respondent determined deficiencies in petitioner's income tax as follows: Sec. 293(b)
Year
Deficiency
Additions to Tax
1941
$ 522.82
$ 261.41
1942
2,192.69
1,096.35
1943
5,006.50 *
2,503.25
1944
9,447.46
4,723.73
1945
7,094.78
3,547.39
1946
2,689.15
1,344.58
The cases were consolidated by agreement of counsel. The issues presented are: (1) whether and to what extent petitioner understated *95 his net taxable income for the years 1941 through 1946; (2) whether part of any deficiency found for any of the years enumerated was due to fraud with intent to evade the payment of tax; (3) whether the statute of limitations applies to the years 1941 and 1942; (4) whether, and in what manner, the Current Tax Payment Act of 1943 is applicable, and (5) whether the use of the net worth and expenditures method as evidence of understatements was proper. Subsidiary issues arise (a) with respect to the disposition of docket No. 44282, where two deficiency notices were mailed on the same day which were identical except that one was addressed to the husband alone, while the other was addressed to husband and wife; and (b) with respect to claim of overpayment of income taxes subsequent to filing of petitions to this Court. Respondent concedes on brief that there are no deficiencies or additions to tax with respect to Zora Mills. Findings of Fact General Part of the facts are stipulated (orally and in writing) and are so found and incorporated herein by this reference.
Petitioner B. E. Mills, who for convenience will hereafter be referred to as petitioner, filed timely individual income *96 tax returns for the periods in question with the collector of internal revenue for the district of Tennessee. He resided at Lenoir City, Tennessee. Before moving to Lenoir City, in 1937, petitioner had leased a hotel in Columbia, Kentucky, and had run a coffee shop on the premises. In 1937, he sold the coffee shop, fixtures, bed linen, and towels, and transferred his lease, for a consideration of $2,700. No return was filed by petitioner for the years 1932 to 1937, inclusive; and returns showing no tax due were filed by petitioner for the years 1938 to 1940, inclusive. Petitioner's only source of income during the years 1941 to 1946, inclusive - the years here in question - was from the operation of Hotel General Lenoir in Lenoir City, Tennessee. The hotel was originally purchased from a bank in 1937 by a partnership consisting of Edward Peace, William G. Buchanan, and petitioner. The purchase price to the partnership was $43,000. Buchanan and Peace together paid $23,000 in cash and a note was given to the bank for the remaining $20,000. The note was signed by all three partners, but it was at all times agreed and understood among the partners that petitioner himself was to pay *97 off the note. Security for the payment of the note was given by petitioner to Buchanan and Peace in the form of a note for $5,000, secured by a second mortgage on petitioner's interest in the property. None of the parties intended the $5,000 note to be enforced so long as payments were continued on the $20,000 note to the bank. The $5,000 note was eventually cancelled, no payments having been made thereon, sometime after the $20,000 note to the bank was satisfied. Petitioner rented the hotel property from the partnership for $300 per month. This entitled him to receive all revenues from the renting of rooms and other operations of the hotel proper. The rent from stores and offices occupying space in the hotel building was paid directly to the partnership. Edward Peace acted as treasurer of the partnership. The income received was divided equally among the partners. Petitioner's third, which included his $100 per month share of the rent received by the partnership from the hotel lease, was by agreement paid to the bank directly by Peace to reduce petitioner's indebtedness. Petitioner also made some direct payments to the bank. Up to December 1940, when petitioner purchased the hotel *98 from the partnership, the indebtedness to the bank was reduced by $2,885.28. At this time petitioner was behind in his rental payments to the partnership in the amount of $5,595.60. Understatements of Income (Note: At this point, for convenient understanding, we attach Schedule A - Net Worth and Expenditures Statement, which reflects our conclusions with respect to understatements of income by petitioner for the taxable years before us. Where the letter "S" appears to the left of an item, the item is stipulated. The remaining items are partially in dispute. Where the dispute is factual, we resolve the issue in our Findings, with further explanation in our Opinion to the extent that elaboration of the basis of our ultimate findings seems required. Where the dispute involves the question of whether petitioner has met this burden of proof, we likewise explain our views in the Opinion.) Schedule A
Net Worth and Expenditures Statement
Assets
12/31/40
12/31/41
12/31/42
12/31/43
Hotel General Lenoir
Land
$ 6,500.00
$ 6,500.00
$ 6,500.00
$ 6,500.00
Building
35,000.00
35,000.00
35,000.00
35,000.00
Building Improve-
ments
2,092.50
2,092.50
2,289.10
2,524.50
Furniture, Fixtures
& Equipment
16,519.70
17,754.81
18,394.20
20,445.92
Total - Hotel General Lenoir
$60,112.20
$61,347.31
$62,183.30
$64,470.42
S Cash in banks
$ 1,929.84
$ 21.76
$ 458.75
$ 569.44
Other Real Estate and
Personal Property
S Land - U.S. Highway
#11
S Improvements on above
land
S Automobiles
1,475.00
1,329.00
1,329.00
1,329.00
S Jewelry
990.00
S Refrigerator
159.75
159.75
159.75
U.S. Savings Bonds
1,162.50
Prepaid Loan Expense
2,050.00
1,722.00
1,394.00
1,066.00
Total Assets
$65,567.04
$64,579.82
$65,524.80
$69,747.11
Liabilities and Net Worth
Reserve for Depreciation
$ 2,511.69
$ 4,212.58
$ 7,360.37
$10,525.30
S Accounts Payable - Equip-
ment
623.25
665.10
429.19
202.20
Notes Payable
5,594.36
5,140.44
4,217.35
3,947.38
3,947.38
S Bank Loans Payable
873.00
873.00
S Mortgage Loans Payable
53,000.00
47,762.81
41,667.31
32,433.13
Total Liabilities
$62,602.30
$58,653.93
$53,674.22
$47,108.01
Net Worth
$ 2,964.74
$ 5,925.89
$11,850.58
$22,639.10
Increase in Net Worth
$ 2,961.15
$ 5,924.69
$10,788.52
Add: Personal & Living Expenses
2,007.61
2,711.34
3,639.09
Unclassified Checks
200.00
210.67
817.29
Net Income
$ 5,168.76
$ 8,846.70
$15,244.90
Less: Nontaxable Portion of
Capital
Gain
Net Taxable Income
$ 5,168.76
$ 8,846.70
$15,244.90
Deduct: Net Income per Return
2,484.69
896.12
3,059.94
Understatements
$ 2,684.07
$ 7,950.58
$12,184.96
*99 Schedule A
Net Worth and Expenditures Statement
Assets
12/31/44
12/310/45
12/31/46
Hotel General Lenoir
Land
$ 6,500.00
$ 6,500.00
$ 6,500.00
Building
35,000.00
35,000.00
35,000.00
Building Improve-
ments
2,689.70
4,541.20
4,541.20
Furniture, Fixtures
& Equipment
23,210.40
26,307.36
27,921.53
Total - Hotel General Lenoir
$67,400.10
$72,348.56
$73,962.73
S Cash in banks
$ 1,692.29
$ 3,306.33
$ 959.55
Other Real Estate and
Personal Property
S Land - U.S. Highway
#11
5,100.00
4,000.00
S Improvements on above
land
10,350.00
S Automobiles
1,329.00
1,329.00
1,643.83
S Jewelry
3,205.00
3,205.00
3,205.00
S Refrigerator
159.75
159.75
159.75
U.S. Savings Bonds
2,887.50
2,962.50
2,962.50
Prepaid Loan Expense
738.00
410.00
232.00
Total Assets
$77,411.64
$88,821.14
$97,475.36
Liabilities and Net Worth
Reserve for Depreciation
$13,937.01
$17,592.94
$20,900.63
S Accounts Payable - Equip-
ment
30.00
Notes Payable
3,947.38
3,947.38
3,947.38
S Bank Loans Payable
3,816.68
S Mortgage Loans Payable
19,437.20
12,894.11
6,890.96
Total Liabilities
$37,321.59
$34,434.43
$35,585.65
Net Worth
$40,090.05
$54,386.71
$61,889.71
Increase in Net Worth
$17,450.95
$14,296.66
$ 7,503.00
Add: Personal & Living Expenses
5,378.33
4,931.12
5,796.38
Unclassified Checks
225.00
307.00
324.75
Net Income
$23,054.28
$19,534.78
$13,624.13
Less: Nontaxable Portion of
Capital
Gain
367.75
Net Taxable Income
$23,054.28
$19,534.78
$13,256.38
Deduct: Net Income per Return
2,601.16
4,180.85
5,987.49
Understatements
$20,453.12
$15,353.93
$ 7,268.89
*100 The purchase price of the Hotel General Lenoir to petitioner in 1940 was $45,620.70, of which $6,500 is allocable to land, $35,000 to the hotel building and $4,120.70 to furniture, fixtures and equipment. Included in the above item of $35,000 is $1,000, representing a payment which Buchanan and Peace had made for the roof of the hotel prior to the sale of the property to petitioner. Petitioner purchased two stokers for $822.50 and $270, respectively, which amounts were not a part of the purchase price of the hotel. We find also, as an ultimate fact, that petitioner paid $1,000 to Cardwell Hardware Company as a capital expenditure for waterpipe, toilets, paint, roof coating and roof cement. The total of the items referred to in this paragraph ($2,092.50) is included in assets in opening net worth as "Building Improvements." There is no dispute as to cost of the later acquired items, viz, improvement ($196.60; $235.40; $165.20), roof ( $615), and weather stripping ($1,236.50). The asset "Furniture, Fixtures and Equipment" included in opening net worth consists of the following items: Item
Amount
Originally in building
$ 4,120.70 [1]
Signs
599.00
Cash register
210.00
Signs
45.00
Fans
1,050.00
Refurbishing furniture
700.00
Gas cooking system
1,500.00
Cash register
295.00
Coffee Shop
8,000.00
$16,519.70
*101 United States savings bonds registered in the names of Glenn Mills and his sister ($37.50 in 1942; $487.50 in 1943; $375 in 1944; $75 in 1945; and $56.25 in 1946) were not assets of petitioner. The United States savings bonds reflected in our Schedule A were registered in the names of B. E. and Zora Mills. Prepaid Loan Expense included in opening net worth on Schedule A consists of $1,000 attorney's fee paid to Kennerly and Key and a loan charge to R.F.C. in the amount of $1,050, both arising in connection with petitioner's procurement of a $42,000 R.F.C. loan. The total of $2,050 is amortized over the period of the loan. The estimated useful life of the Hotel General Lenoir building was 37 years as of December 31, 1940, and a reasonable allowance for depreciation is to be calculated on that basis for the years in issue, reflecting allocation of cost as found supra. Part year adjustment is of trivial significance and is disregarded. As to depreciation on building improvements, no dispute arises over an estimated useful life of 10 years for the two stockers and the $615 item for the roof. The following three items of improvements are subject to *102 depreciation on the same principle as the building itself, but since the improvements were later acquired, the estimated useful life is less. The $196.60 item is depreciable over 35 1/2 years; the $235.40 item over 34 1/2 years; and the $165.20 item over 33 1/2 years. On the same principle, the weather stripping item of $1,236.50 has a useful life of 32 1/2 years. The Cardwell Hardware Company items ($1,000 of which is attributed to capital expenditures by petitioner) have an estimated useful life of 37 years from January 1, 1939. As to furniture, fixtures and equipment, we find an estimated useful life of ten years from date of acquisition, except that as to the original items of furniture which were in the building when acquired by Mills, we have depreciated on a like basis from December 31, 1940. Since there is no dispute as to depreciation on automobiles, we need only state, for ready reference, that our Findings, as reflected inSchedule A, are identical with those in the revenue agent's report. There is no dispute as to the amounts included in Notes Payable, per our Schedule A, as far as it goes. (The disputes arise over items of alleged Notes Payable not included in Schedule *103 A, and are discussed in our Opinion, infra.) (Note: With respect to the items in Schedule A titled "Personal and Living Expenses" and "Unclassified Checks," see Opinion, infra.) Respondent determined deficiencies in the instant case by the use of the net worth and expenditures method. Petitioner's books and records for the years here in question did not clearly or accurately reflect his net income. (See primary facts found under the heading of Fraud, next infra.) Fraud Petitioner reported his income on a cash receipts and disbursements basis. In 1943, he received from J. C. Penney Co. two checks for rent, in the respective amounts of $119.43 and $1,800.78. The latter check was endorsed or assigned by him to Buchanan and Peace in part payment of an indebtedness to them. Neither check was recorded on petitioner's books nor reported by him in his income tax return. The checks were income to petitioner. In 1943, petitioner charged to dormitory expense $483, purportedly paid to Monger Furniture Company and $125 purportedly paid to Miller's Inc. The amounts and payees above referred to appear on petitioner's check stubs. No such checks cleared through petitioner's bank. In *104 1943, petitioner paid the sum of $292.29 by check to Lancaster Brothers. The original entry on the check stub was also $292.29. Petitioner increased this figure on the stub to $492.29 and the larger amount was included in the deductions taken by him on his 1943 income tax return. Petitioner's bank deposits in 1943 exceeded by $5,506.70 the funds available for deposit as disclosed by his books. His expenses per income tax return were $2,467.58 less than his expenses per books. In 1944, petitioner received a rent check from J. C. Penney Co. in the amount of $2,751.56 which constituted income to him. The check was not entered on his books when received, and was not included in the yearly summary of his income. Some time later, the amount was entered on his books. It was not reported in his income tax tax return. The yearly summary was not amended to include it. No claim is made that an amended income tax return was filed to correct the omission. In 1944, the amount of $1,290.20 was charged to dormitory expense, and included in expense deductions on petitioner's income tax return. The payment was in fact a capital expenditure for the purchase of furniture. In the same year, two checks *105 for $500 each to Miller's Inc., and one of $250.22 to Fowler Brothers, (all three checks being for furniture) were charged to expense. While the details are not disclosed in the record, petitioner's accountant found "many" items charged to expense which should have been recorded as capital expenditures. Petitioner's expenses deducted on his 1944 income tax return exceeded the expenses shown on his books by more than $9,000. There were a number of duplicated expense deductions on petitioner's returns. This resulted from the fact that although deductions were taken as disclosed by petitioner's books, some additional separate deductions were taken for salaries, light and water, coal, repairs, and other items not specifically designated in the record, which additional separate deductions duplicated items which were also deducted as part of the expenses disclosed by the books. There were no accounts on the books for some of the items separately deducted. In 1934, petitioner's bank deposits exceeded funds available for deposit, as disclosed by his books, by more than $6,000. In 1945, a check stub dated September 15, showed $850 which was charged to decorating and deducted as a business *106 expense. The bank records fail to show that any check of that amount cleared the bank. On September 19, however, a check for $650 cleared the bank, being paid to Ward Belmont College as tuition for petitioner's daughter. In the same year, two checks in the amounts $600of and $700, respectively, were charged to decorating and interest expense and were deducted as expenses on petitioner's income tax return. These amounts were in fact paid to G. W. Bailey for the purchase of land. In 1945, $1,236.50 was paid for weather stripping the hotel, but was charged to and deducted as an expense. The payment in question was a capital expenditure. The expenses deducted in petitioner's income tax return for 1945 exceeded expenses per books by a little over $6,000. Bank deposits in 1945 exceeded funds available for deposit per books by $2,329.51. In 1946, $428.20 was paid by petitioner to Mutual Life Insurance Co. for personal insurance but was charged to insurance expense account. Although unspecified in the records as to specific dates and amounts, many insurance premiums on personal policies were taken as expense deductions during the years before the Court. In 1946, a check was issued *107 for $363.33 which was charged to decorating expense. The stub shows the payee to be C. C. Gray, but the payee was in fact Miller's, Inc. Of the above amount, $310.08 represented a capital expenditure for hotel equipment, and the balance of $53.25 was a personal expenditure. Another small item in 1946 was the expenditure of $116.66 for the purchase of a typewriter. The amount paid was charged to decorating. The bank deposits for 1946 exceeded the funds available for deposit per books in the amount of $3,978.02. Petitioner did not take the stand, and failed to present any acceptable evidence in denial or explanation of any of the facts found herein under the heading of Fraud. A part of the deficiency for each of the years 1943 to 1946, inclusive, was due to fraud with intent to evade taxes. Payments by Petitioners after Filing Petitions with This Court After the petitions were filed in the instant case, petitioners transmitted to the "Director of Internal Revenue Service," Nashville 3, Tennessee, a check for $26,953.40 with accompanying letter dated January 4, 1954, signed by B. E. Mills and Zora Mills. The transmittal letter prov ded, in part, as follows: "The petitions *108 are now pending before the Tax Court, and taxpayers believe that some time will elapse before a decision will be rendered. Therefore, taxpayers for the sole purpose of avoiding the further accrual of interest pending final determination of the tax liability; and pursuant to the provisions of Section 272(d) of the Internal Revenue Code, hereby waive the restrictions provided by law upon the assessment and collection of the said asserted deficiencies of the income tax of $26,953.40, subject to the conditions of payment set forth herein. "Accordingly, there is enclosed herewith taxpayer's check for the alleged deficiencies totaling $26,953.40, which is computed as follows: Deficiency
per 90-day
Interest
"Year
letter
from
to
Amount
Total
1941
$ 522.82
3/15/42
$ 522.82
1942
2,192.69
3/15/43
2,192.69
1943
5,006.50
3/15/44
5,006.50
1944
9,447.46
3/15/45
9,447.46
1945
7,094.78
3/15/46
7,094.78
1946
2,689.15
3/15/47
2,689.15
$26,953.40
"In paying this amount taxpayers are not admitting that they owe the tax, are not conceeding the correctness thereof, and do not waive *109 any rights which they have to prosecute to a final determination the aforesaid appeals to the Tax Court; but they are paying it solely for the purpose of stopping the further accrual of interest." Certificate of Assessments and Payments, Office of the District Director of Internal Revenue, contains the following notations with respect to the payment above referred to: (A check for $26,953.40, in the name of B. E. & Zora Mills, was received 1/6/54 and deposited in 9-B unidentified account.) (See Ex. 7, p. 2.) (A check for $26,953.40 from E. B. & Zora Mills was received 1/6/54 as an advance payment of deficiencies as follows: 1941
$ 522.82
1942
2,192.69
1943
5,006.50
1944
9,447.46
1945
7,094.78
1946
2,689.15) (See Ex. 7, p.3)
Opinion Zora Mills Zora Mills, wife of B. E. Mills, is one of the petitioners in Docket No. 44283, but not in Docket No. 44282. Respondent concedes that Zora did not sign any of the returns in issue; that none of the returns are joint returns; that Zora had no taxable income in any of the years in question; and that there are no deficiencies in tax or additions to tax as to Zora for any of the years in issue. Docket No. *110 44282 Respondent issued two statutory notices of deficiency on the same day (June 24, 1952), each covering all of the years in issue. The notices are substantially identical except that one (petition filed in Docket No. 44282) was with respect to B. E. Mills only, while the other (Docket No. 44283) was with respect to both B. E. and Zora Mills. Petitioner has filed a motion to dismiss in Docket No. 44282. Respondent agrees that one or the other case should be dismissed, and raises no objection to the dismissal of Docket No. 44282 provided Docket No. 44283 is decided on the merits and not on jurisdictional grounds. As will appear herein, Docket No. 44283 is disposed of by us on the merits, and in view of respondent's nonopposition, we will enter a decision to the effect that there are no deficiencies or additions to tax in Docket No. 44282. We foresee no technical imponderables, but in order to protect the rights of the parties, we will withhold our decision in Docket No. 44282 at this time and enter it at the same time as our decisions in Docket No. 44283, so that in the event of appeal in the latter docket, a protective appeal may be taken, if desired, from our decision in the *111 former. Limitations The issue of limitations arises only with respect to the years 1941 and 1942. Timely returns were filed for each of these years and the statutory notice was issued more than five years thereafter. Assessment and collection were barred, therefore, unless the returns were false and fraudulent with intent to evade taxes. In our discussion of the fraud issue, infra, we hold that respondent has failed to establish fraud for either 1941 or 1942, and we find, therefore, that the statute of limitations is a bar with respect to both years. Current Tax Payment Act of 1943 Since we find no additions to tax applicable by reason of fraud for the year 1942, and since it is not contended that petitioner was convicted of any criminal offense with respect to the tax for the year 1942, it is clear that section 6 of the Current Tax Payment Act of 1943 is applicable. It will be necessary, therefore, for us to determine the amount of any understatement for the year 1942 (which we do infra under the heading "Understatements of Income"). The resulting addition to any deficiency for the year 1943 will be determined under Rule 50. Respondent has made appropriate claim therefor. *112 We note, for completeness, that the application of the bar of the statute of limitations for the year 1942 does not bar the finding of an additional deficiency for 1943 under the provisions of section 6 of the Current Tax Payment Act of 1943. Lawrence W. Carpenter, 10 T.C. 64 (1948). Application of Net Worth Method Petitioner contends that his books and records were adequate as a basis for determining income, and that respondent is, for that reason, precluded from resorting to the so-called net worth plus nondeductible expenditures method, to demonstrate substantial understatements of net income, or to establish the correct amount of such net income. While, as discussed infra, we do not agree that respondent's right to use the net worth approach is dependent upon some patent defect in the books and records of the taxpayer, we think it clear that, if reasons must be assigned, they are ample in the instant case. In two of the years involved, the petitioner's returns show a substantial excess of deductions over the amounts recorded on the books. Petitioner's own accountant agrees that duplicate deductions were taken in several years. Likewise, there were cash expenditures *113 which he could not reconcile. Bank deposits were made in several years in excess of the cash which appeared available therefor on the books. Two substantial rent checks were unreported, one of which was never entered on the books, and the other, though entered under unexplained circumstances, was not included in the yearly summary of income. Capital expenditures and some personal expenses were charged on the books to business expense. Salary and wage records were unavailable. While some of the facts above mentioned do not alone establish understatements of income (although others do), all of them are obviously suggestive of the likelihood of understatements and the need of an audit or check-up on some basis which will bring the facts to light, test the accuracy of the books and records, and demonstrate the correct amount of petitioner's income. Under the circumstances, it is our view that the use of the net worth technique was fully justified and was appropriate to the solution of the problems presented. As indicated above, however, the right of respondent to resort to the net worth method is not dependent on finding first (and without regard to the implications of the net worth *114 computation) that petitioner's books and records were not sufficient to properly reflect income. In Morris Lipsitz, 21 T.C. 917 (1954) affd. (C.A. 4, 1955) 220 Fed. (2d) 871, certiorari denied 350 U.S. 845, we said (p. 931): "And when the increase in net worth is greater than that reported on a taxpayer's returns or is inconsistent with such books or records as are maintained by him, the net worth method is cogent evidence that there is unreported income or that the books and records are inadequate, inaccurate, or false. It is not correct to say that the use of the net worth method is forbidden where the taxpayer presents books from which income can be computed, for the net worth method itself may provide strong evidence that the books are unreliable. * * *" See Estate of W. D. Bartlett, 22 T.C. 1228 (1954) in which the taxpayer's books appeared to be superficially adequate. This view recognizes that the so-called net worth method is not itself a system of accounting, but merely a technique for reconstructing a taxpayer's correct net income, regardless of the method of accounting followed by the taxpayer in keeping his books. *115 By a showing of a substantial increase in net worth in excess of reported income, without reasonable explanation of such discrepancy as being attributable to gifts, inheritances or other nontaxable receipts, the net worth method furnishes persuasive evidence of unreported income and reflects on the over-all accuracy of income reported on the books and on the returns. See Holland v. United States, 348 U.S. 121 (1954); Michael Potson, 22 T.C. 912 (1954); Estate of George L. Cury, 23 T.C. 305 (1954); Harry Gleis, 24 T.C. 941 (1955) affd. 245 Fed. (2d) 237 (C.A. 6, 1957). We need not, therefore, restrict the use of the net worth method to these cases in which we find particular inaccuracies, omissions, irregularities or inconsistencies in the taxpayer's books. Nevertheless, those which we have pointed out in the instant case add significance to the need of using the method. On the facts before us we think the justification for the use of the net worth method is fully demonstrated. Understatements of Income Although we approve the use of the net worth-expenditures method to determine petitioner's income, we hold that *116 petitioner has met the burden of proof of error in respondent's determination with respect to certain items. For convenience we have set out supra our Schedule A which is a net worth schedule setting forth the understatements which we have determined for the years here involved. Many of the items were stipulated, and others, though not stipulated, were undisputed. The items which petitioner contests are the opening net worth as it reflects the cost to petitioner of the hotel property; building improvements made thereon; furniture, fixtures and equipment purchased by petitioner before January 1, 1941, (the increases after that date are undisputed); the amount which petitioner's son, Glenn, contributed towards the purchase and improvement of certain land acquired by petitioner in 1945; the amount of savings bonds, purchased by petitioner with Glenn's money; prepaid loan expense; teartment of alleged loans to petitioner by his father ($6,190) and mother ($7,100); and the additions to income related to living expenses and unidentified checks. Respondent determined the cost of the hotel to petitioner in 1940 to be $45,620.70, allocable $6,500 to land, $35,000 to buildings, and $4,120.70 *117 to furniture, fixtures, and equipment. Petitioner and his representative agreed in writing to these amounts. We see no reason to disturb the determination. The major difference between respondent and petitioner is with respect to the treatment of an item of back rent in the amount of $5,595.60. In determining the cost of the hotel to taxpayer, respondent deducted the above amount as not being a part of the purchase price. In the computation of basis of the hotel property (to which petitioner agreed in writing) the following words and figures appear: "Less: Personal liability for rents in arrears due by B. E. Mills to Buchanan and Peace included in $11,000 note (see attached sheets) $5,595.60." In view of the written agreement, and in the absence of evidence to the contrary, we accept respondent's view that the amount of $5,595.60 was not a part of the purchase price. Another difference between petitioner and respondent is that an item of $1,000 paid for the hotel roof is included in the purchase price by respondent and depreciated over the remaining life of the building (which we hold to be 37 years) while petitioner treats the roof as a building improvement and depreciates it *118 over a 10-year life. There is no satisfactory showing that the roof had a life different from the life of the building. Moreover, respondent's treatment is supported by the calculation to which petitioner agreed in writing. The difference is of minor significance since it affects only the annual amount of depreciation, and does not otherwise affect the net worth increase in any year before us. We accept respondent's view since it is supported by the agreed figures, and petitioner has failed to establish error. On the other hand, while petitioner allocates only $1,500 to original furniture and fixtures, respondent allocates $4,120.70, likewise in accordance with the calculations to which petitioner agreed in writing. We accept respondent's figure, which, in relation to annual depreciation, is to the advantage of petitioner. Respondent allocates $6,500 of the purchase price to land, while petitioner allocates $6,716.30. Since the same figure applies to the beginning and end of each year here involved, it does not affect net worth increase. We accept respondent's figure, which is supported by the agreed calculations above referred to. Under the heading of Building Improvements, *119 petitioner includes an amount of $6,000 which he claims was paid for items purchased from Cardwell Hardware Company over a period of three years prior to December 31, 1940. The items are alleged to consist of waterpipe, toilet repairs, some complete toilets, paint, roof coating and roof cement. Respondent allowed nothing for the foregoing. Petitioner's sole reliance is upon the evidence of R. G. Cardwell, whose testimony was vague, speculative and unconvincing. We believe that some purchases were made by petitioner from Cardwell Hardware, but we are not satisfied that they totalled anything like $6,000 during the three-year period. Moreover, Cardwell testified that the payments were "anywhere from ten or fifteen dollars, maybe some weeks, on up to may a hundred dollars other weeks." Purchases from ten to fifteen dollars are hardly suggestive of capital expenditures, and there appears to be no doubt that considerable amounts were paid for ordinary repairs to the hotel. Mills did not take the stand, although the burden of proof rested with him. Nevertheless we dispose of the item as best we can under the principles of Cohan v. Commissioner, 39 Fed. (2d) 540 (C.A. 2, 1930) *120 resolving any reasonable doubts against petitioner. Considering all of the foregoing circumstances, we hold that, of the claimed expenditures of $6,000 (the amount of which we are not satisfied to be correct)', $1,000 is to be attributed to capital expenditures by petitioner, and is to be included as a part of the item "Building Improvements" listed as an asset in Schedule A. The remaining $5,000 claimed by petitioner is disallowed because of petitioner's failure to sustain the burden of proof. With respect to furniture, fixtures and equipment, we have allowed $4,120.70 for furniture originally in the building on the basis of the agreement referred to above. In addition, petitioner includes in his opening net worth the following four items which were excluded by respondent: fans, $1,050; refinishing furniture, $700; gas cooking system, $1,500; and coffee shop, $8,000. The supporting testimony on these items was, respectively, that of four substantial businessmen of Lenoir City, each of whom had a clear recollection of the transactions in which he participated. We have no doubt as to their credibility. While the amounts to which they testified were admittedly not accurate to the penny, *121 we are satisfied that they were substantially correct. We think that some consideration must be given to the lapse of time between the transactions, the investigation and the trial, with explained absence of records. Upon the whole picture, we do not feel justified in discounting the amounts to which they testified (although we did not hesitate to do so in the Cardwell transaction for the reasons set forth supra). We have therefore included the four items to which reference has just been made. Again, the practical significance of the inclusion of these items is only with respect to the annual amount of depreciation. With respect to the item of United States savings bonds in the net worth statement, the evidence is confusing and unsatisfactory. Glenn Mills had no clear recollection of what amounts he sent home, or the particular years in which he sent them. We are satisfied, however, that he did send some money home, and we think it is a reasonable inference that he contributed the cost of the bonds purchased in the names of himself and his sister ($37.50 in 1942; $487.50 in 1943; $375 in 1944; $75 in 1945; and $56.25 in 1946). It was natural for his father to put in Glenn's and *122 his sister's names the amounts which Glenn contributed. We find no satisfactory basis in the evidence, however, for inferring that Glenn contributed the cost of any of the bonds put in the names of his father and mother, or if he did, how much his contribution may have been, and in what years. Certainly Glenn's testimony has failed to meet the burden of proof of error in respondent's determination in this respect, and neither his father nor his mother testified. We, therefore, include in the net worth statement all United States savings bonds in the names of B. E. and Zora Mills, but exclude those in the names of Glenn and his sister. With respect to the item of Prepaid Loan Expense, respondent allows the amount of $1,420 in opening net worth, while petitioner claims $2,050. There is no dispute about the fee of $1,000 to Kennerly and Key included in the above item. Respondent, however, allows only $420 as R.F.C. loan charge. We think it is clear from Exhibits 14 and 20H (the latter a joint exhibit) that the amount of the R.F.C. loan charge should be $1,050. There appears to be no real question as to the accuracy of this figure. Neither party raises any question with respect to the *123 period over which the loan charges are to be amortized. We, therefore, hold with petitioner on this item. We come now to the factor of depreciation as reflected in the item of Reserve for Depreciation in the net worth statement which embodies our conclusions. We have already disposed of all disputed issues as to basis, and need consider only the remaining questions as to probable life, or rate. As to the building, respondent depreciates over 50-year life from the time of acquisition (1940) by petitioner, and totally disregards the fact that the hotel was built in 1927. Petitioner claims a 40-year life from 1927, and, in effect, a 27-year life from December 31, 1940, as applicable to petitioner. His supporting testimony is unconvincing. On the other hand, respondent's position is clearly unsupportable. We have considered all of the evidence in the record concerning the hotel building, including a post card picture of the exterior of the building, filed as an exhibit. It is our view, upon the record, that a useful life of 50 years from 1927, when the hotel was built, would have been reasonable to a taxpayer who then acquired it, but that, as applicable to petitioner, 13 years of *124 the life of the hotel having been used, depreciation should be allowed on the basis of a useful life of 37 years from December 31, 1940. We have disregarded adjustments for part years as de minimis. With respect to furniture, fixtures and equipment, petitioner urges a 10-year useful life except for the coffee shop equipment, as to which he claims a five-year life. Respondent does not contribute to the discussion. As to the coffee shop equipment, petitioner's witness suggested a life of five to ten years. Since he can be no more definite, we see no course except to adopt the 10-year life, since there is no basis for accurate discount to a lesser period. As to the other items of furniture, fixtures and equipment, we accept petitioner's view and apply a 10-year life. With respect to the item of Building Improvements, our Findings of Fact are dispositive of the factor of useful life. As to the stokers and the $615 item relating to the roof, there appears to be no dispute. As to the remaining items, we have depreciated on the principle of a useful life of the building of 37 years from December 31, 1940, giving effect, however, to dates of acquisition of the respective items acquired *125 subsequent to that date, and reducing the useful life accordingly. There is no dispute with respect to reserve for depreciation on automobiles. The item of Notes Receivable in our net worth statement is undisputed as far as it goes. It is necessary, however, to discuss claims by petitioner that there should be included in the net worth statement alleged loans to petitioner by his father (which petitioner claims in varying amounts as loans payable up to December 31, 1944, and as notes payable as of December 31, 1945, and December 31, 1946); alleged loans to petitioner by his mother; and alleged advances by Glenn on land and improvements. As to the claim of indebtedness to the father for loans, it is unimportant whether they be treated as loans payable or notes payable. In fact, it is immaterial, upon the view we take, whether or not the amounts claimed are included in the net worth statement at all. The son delivered to the father a note dated December 20, 1945, for $6,190, but there is no evidence that the father loaned any money to the son at that time. It seems clear from the evidence that the note merely evidenced the total of a prior loan or loans. The father, who was 91 *126 years old at the time of the trial, took the stand. He was quite hard of hearing, and vague in many of his statements. On direct examination, in answer to questions propounded by his son's counsel, his testimony appears to be to the effect that whatever money he loaned to his son was loaned in 1940. In any event, he did not testify that he loaned anything to his son after 1940, and there is no other evidence in the record of a loan or loans by him to his son after that year. Since the only evidence before us is to the effect that the loan was made in 1940, it follows that if we were to include the item in net worth at all (whether as loans payable or notes payable is immaterial), the same amount would be included in the net worth statement, in opening net worth and at the end of each net worth year, so that no decrease (or increase) of net worth would be attributable thereto. Petitioner argues on brief that the loans were made at "various times throughout the years 1941 through 1945," but as already stated, there is no evidence to support this assertion. We repeat, in this connection, that petitioner himself did not take the stand. The affirmative evidence, such as it is, supports *127 respondent's position in excluding any factor based upon loans to petitioner by his father (or, with the same result, including it in opening net worth and at the end of each net worth year). For completeness, we add that it is obvious that petitioner has failed to meet the burden of proof of error on the part of respondent in excluding this factor from consideration. As to the alleged indebtedness to the mother in the amount of $7,100, there is no evidence in the record showing the existence of the loan or loans or the dates when the loans were made. A typewritten list and a small notebook purporting to be a record made by petitioner of the amounts and dates of the loans was proffered on his behalf. Petitioner, however, did not take the stand and, of course, was not subject to cross-examination with respect to the notations purporting to have been made by him. His mother was dead. There was no evidence of how or when the notations were made, or whether or not they were true. We sustained respondent's objection to their admission into evidence. We find no supporting testimony which would warrant our taking a different position. Petitioner complains further that the notations were *128 called to the revenue agent's attention at the time of the investigation, but that "the revenue agents made no effort to trace these funds into bank accounts of the petitioner * * *." It is obvious that the bank accounts were as available to petitioner as to the agents, but petitioner failed to present them. Neither the respondent nor his agent was required to accept petitioner's statement or memoranda as true and correct. We think it is clear that petitioner has failed to sustain the burden of proof on this issue. Petitioner does not object to the inclusion in his assets as of December 31, 1946, the amount of $4,000 for Land - U.S. Highway No. 11 and $10,350 for improvements thereon. He claims, however, that he should be allowed as a deduction from net worth an alleged liability to his son Glenn in the amount of $5,100 which, petitioner claims, represents amounts advanced by Glenn for the latter's anticipated interest in the property and improvements. Petitioner did not testify and relies upon Glenn's testimony to support his contention. Glenn testified that he worked as an aircraft technician in Mobile, Alabama, for part of 1943. His base pay in this job was $2,200 per year. *129 In June of 1943 Glenn entered military service. His original army pay was $50 per month as a private. Later, he received $66 per month as corporal, and in August or September of 1945 he was promoted to technical sergeant, receiving pay of $135 per month. While in the Army, Glenn was stationed part of the time overseas. Beginning with the period when he served as a technician in Mobile, and during the time he was in the Army, both in this country and overseas, Glenn claims that he sent his father all of his pay other than his expenses. It is claimed that his father bought United States savings bonds for him with part of the money, and retained part of it in cash. When Glenn returned home, he testified that these assets were turned over to him. Glenn had no clear idea of how many bonds were turned over to him. When pressed, he answered that the amount was "Oh, three thousand, thirty-five hundred dollars, maybe." The balance of the $5,100 cost and improvements on Highway No. 11 claimed to have been paid for by Glenn was supposedly paid from the money Glenn sent home which was not converted into bonds. Glenn's testimony is vague. How much he actually sent home is quite conjectural. *130 An analysis of his earnings from the time he was a civilian technician until he returned from military service (in March of 1946) demonstrates that the amounts which he sent home could not have totalled anything like $5,100, even if we accept the fact that his expenses in Mobile were only $12 per week, as he claims, and further assume that he had no expenses while in the Service. He himself suggests no other source for the $5,100, and he admitted on cross-examination that some part of his overseas pay was in invasion currency. We also note that the $5,100 claimed is in addition to amounts sent home by Glenn which were used to purchase bonds in his and his sister's names. Furthermore, none of the bonds so purchased, or those purchased in the name of his father and mother were cashed during the period in question. After careful consideration of the patent exaggerations in Glenn's testimony offered in relation to his alleged advances of $5,100, his demeanor on the stand, and his obvious bias, we find his testimony unacceptable. We hold, therefore, that petitioner has failed to establish by any acceptable evidence what amounts, if any, constituted a liability to his son as of December 31, 1946. *131 Petitioner himself failed to take the stand with respect to the alleged indebtedness to his father, mother, and son, although his father was over 90 years of age; his mother was dead (petitioner claiming that he had records in his own handwriting of the dates and amounts of the alleged loans made by her to him); and although, with respect to the alleged debt to his son, it is claimed on behalf of petitioner that he himself received all of the money allegedly sent home by his son, and personally handled the investment in the property on U.S. Highway No. 11. On the question of living expenses, the respondent's determination is prima facie correct. Petitioner does not appear to question the accuracy of the amounts so determined. On brief, however, he takes the position that at least $1,000 out of the living expense item must be attributable to meals and lodging at the hotel. He then argues as follows: "Since petitioner was actively managing the hotel and coffee shop these living costs are ordinary and necessary expenses of the business." While we have no doubt that some part of petitioner's living expenses were attributable to meals and lodging at the hotel, there is no basis in *132 the record for fixing the amount at a minimum of $1,000. If this were a factor necessary to our decision in the instant case, we would give consideration to the evidence as a basis for a finding under the rule in Cohan v. Commissioner, supra. The decisive factor, is, however, that on any approach to the problem, (see discussion of cases, infra) the burden is upon petitioner (the sole proprietor) to show that it was necessary, or for the convenience and benefit of the operation of the business, for him to live in the hotel and eat his meals there. Petitioner appears to assume such facts, but the assumption is without support in the record. Again it is significant that petitioner did not testify. It is not for us to speculate on what his evidence might have been or what might have been developed on cross-examination. We have no doubt that some hotel proprietors may find it necessary, beneficial and convenient to the operation of the business for them to eat and sleep on the premises. Others may not. The issue, however, is one of fact, and the burden of proof of such fact is on petitioner. Petitioner relies upon Everett Doak, 24 T.C. 569 (1955) but in that *133 case we found as an affirmative fact that it "was necessary in the operation of the hotel that the two petitioners live in the hotel and eat the meals in the hotel which they actually ate there during 1950." No such facts are established in the instant case. We add for completeness that we were reversed in Doak, supra, sub nom. Commissioner v. Doak, 234 Fed. (2d) 704 (C.A. 4, 1956), the Court of Appeals holding that, even though like items furnished an employee, under the "convenience of the employer" rule, would be deductible by the employer, the rule is otherwise with respect to food and lodging of a husband and wife owning and operating the business as partners. A like conclusion was reached in Commissioner v. Moran, 236 Fed. (2d) 595 (C.A. 8, 1956), reversing a Memorandum Opinion of this Court [14 TCM 813; 1955-202] in which we had found as a fact that petitioners "lived at the hotel and took their meals there of necessity and for the convenience and benefit of the business." In George A. Papincau, 16 T.C. 130 (1951) upon which relied in Doak, supra, we found from the stipulated facts that the "arrangement *134 was essential in order to manage the hotel to the best advantage of the partnership during all hours of the day and night." Again in the instant case, there is no like evidence, and we cannot supply it by conjecture or speculation. Since petitioner has failed to meet the burden of proof, we must hold for respondent on the issue of living expenses. Under these circumstances, there is no occasion for us to discuss the rationale of Commissioner v. Doak and Commissioner v. Moran, both supra. The remaining disputed item included in Schedule A is based upon respondent's determination adding "unclassified checks" to income in the amounts set forth in the schedule. Petitioner does not question the amounts, but argues that where income is computed on a net worth basis, there is no occasion to adjust for unexplained items. We do not aggee with this view. The unclassified checks may have been used to acquire unidentified assets, or may represent personal expenditures, or both. (Petitioner offered no evidence to the effect that any of said checks were for the purpose of assets included in the net worth statement, or for personal or living expenses included therein by respondent.) It is possible, *135 of course, that such unclassified checks may have represented deductible items in whole or in part, but it is reasonable to infer that if they did, petitioner would have offered evidence to demonstrate the facts to his advantage. As the record stands, respondent's determination is presumed to be correct, and we must sustain him since there is no evidence demonstrating error. Fraud Respondent has determined additions to tax under section 293(b) for each of the years in question, alleging that some part of the deficiency for each of said years was due to fraud with intent to evade taxes. He also asserts that petitioner's returns for 1941 and 1942 (the only years with respect to which the issue of limitations arises) were false and fraudulent with intent to evade taxes. The burden of proof is upon respondent to establish fraud by clear and convincing evidence. Frank Imburgia, 22 T.C. 1002 (1954). We think respondent has failed to meet this burden of proof of fraud for the year 1941. While our net worth computation for that year shows an understatement of income of $2,684.07, the computation is based in part upon petitioner's failure to meet his burden of proof. Respondent, *136 however, cannot meet his own affirmative burden of proof of fraud on the basis of petitioner's failure to discharge the burden of proving error in respondent's determination of deficiencies. W. A. Shaw, 27 T.C. 561, 570 (1956); Drieborg v. Commissioner, 225 Fed. (2d) 216 (C.A. 6, 1955). Moreover, a mere understatement of income does not, in itself, establish fraud. James Nicholson, 32 B.T.A. 977 (1935), affirmed 90 Fed. (2d) 978 (C.A. 8, 1937). Respondent failed to prove the omission of any specific item of income in the return for 1941. The revenue agent testified that the expenses per return were the same as expenses per books, and the record fails to show that any significant deduction was improperly taken in that year. Moreover, while duplicated deductions were found in the returns for some of the other years, none were established for 1941. We therefore hold that respondent has failed to establish fraud for that year. Our views as to 1942 are substantially the same as for 1941. For the reasons already stated, and upon the facts and circumstances before us, we cannot predicate fraud solely upon our finding of an understatement, *137 in part based upon the presumption of correctness of respondent's determination. No specified omission of an item or items of income has been established, and no improper deduction has been proved. The excess of $81.46 of deductions per return over deductions per books, as found by the revenue agent, is not significant. We hold that respondent has failed to meet the burden of proof of fraud for 1942. As to 1943, however, we hold that respondent has proved by clear and convincing evidence that some part of the deficiency was due to fraud with intent to evade taxes. In February of 1943, petitioner (who was on the cash basis) received a check for $1,800.78 for rent from J. C. Penney Co. which he assigned or endorsed to Buchanan and Peace to be applied to his indebtedness to them. He personally received the check, and could not have been unaware that it was income to him. The amount was never recorded on his books, and was not included in his income tax return for the year in question (or any other year). That it was not a mere oversight is apparent from the fact that in 1944 (to be considered infra) he received from the same company a like check of $2,751.56 which he did not report *138 for income tax purposes. Moreover, in 1943, he received a smaller rent check from Penney ($119.43) which he did not include in his income tax return. Also in 1943, he charged to dormitory expense $483 purporting to have been paid to Monger Furniture Company, and $125 purporting to have been paid to Miller's Inc. The amounts and payees appear on his check stubs, but no such checks cleared through his bank. Again in 1943, he paid to Lancaster Brothers the sum of $292.29 by check. The original entry on the check stub was the same amount. Petitioner, however, increased the figure on the stub to $492.29 and included the larger amount in the deductions taken on his income tax return for 1943. It should also be noted that petitioner's deposits in bank for 1943 exceeded funds available for deposit as disclosed by his books in an amount in excess of $5,506.70. On the other hand, although deductions on petitioner's returns for 1944 and 1945 greatly exceeded deductions per books (see discussion infra), deductions for 1943 per return were $2,467.58 less than deductions per books. There is no evidence in the record explaining the facts which we have summarized above relating to the year *139 1943, and we have no doubt that petitioner's acts and omissions were wilfully and intentionally fraudulent. It is only necessary for respondent to prove that some part of the deficiency was due to fraud. That a part of the deficiency resulted from the circumstances which we have outlined is obvious. In 1944, as indicated supra, petitioner received a rent check from J. C. Penney Co. in the amount of $2,751.56 which he did not report in his income tax return. It is apparent from the record that he did not enter it on his books when received, and it was not included in his yearly summary of income. Sometime later, it was entered on his books, but the yearly summary was not amended to include it, and no amended income tax return appears to have been filed. Taken together with the rent checks omitted in 1943, we have no doubt that the omission was intentional. In 1944, the amount of $1,290.20 was charged to dormitory expense and was included in the expense deductions on petitioner's income tax return. The payment was in fact made for the purchase of furniture and should have been recorded as a capital expenditure. While the item is not large, it is part of a pattern of similar capital *140 expenditures charged to expense during the years before us. Petitioner's own accountant found that many items were expensed which should have been recorded as capital expenditures. In the same year, two checks of $500 each to Miller's, Inc., and one of $250.22 to Fowler Brothers - all for furniture - were charged to expense. Petitioner's expenses shown on his 1944 income tax return exceeded his expenses per books in an amount in excess of $9,000. This is particularly significant since petitioner's accountant and the revenue agent found numerous duplications of expense deductions in some of petitioner's income tax returns, accomplished by first deducting expenses per books and then duplicating some of the items by separate deductions for salaries, light and water, coal, repairs, and other categories not specifically designated. There were no separate accounts on the books for some of the items separately deducted. It may be added that in 1944, petitioner's bank deposits exceeded funds available for deposit, as disclosed by his books, in an amount in excess of $6,000. In view of the circumstances above discussed in relation to the year 1944 (which petitioner, who did not take the *141 stand, failed to explain) we hold that respondent has proved by clear and convincing evidence that part of the deficiency for 1944 was due to fraud with intent to evade taxes. We next consider the year 1945. In that year, a check stub dated September 15, 1945, showed $850 which was deducted as an expense. The bank records do not show that any check of that amount cleared the bank. On September 19, 1945, however, a check for $650 cleared the bank. It was paid to Ward Belmont College for the tuition of petitioner's daughter. In 1945, two checks of $600 and $700, respectively, were charged to decorating and interest expense and were deducted as expenses on petitioner's income tax return. The above amounts were in fact paid to G. W. Bailey for the purchase of land. In the same year, the amount of $1,236.50 was paid for weather-stripping the hotel, but was charged to and deducted as expense. This is, of course, another instance in the pattern of expensing capital expenditures. In 1945, expenses deducted per return exceeded expenses per books by a little over $6,000. Our comments relating to duplicated expenses in discussing 1944 are equally applicable here. Bank deposits in 1945 *142 also exceeded funds available for deposit per books in the amount of $2,329.51. The record contains no acceptable evidence explaining the foregoing. We hold as to 1945, upon the foregoing, that respondent has established, by clear and convincing evidence, that part of the deficiency was due to fraud with intent to evade taxes. In 1946, $428.20 was paid by petitioner to Mutual Life Insurance Company for personal insurance, but was charged to and deducted as insurance expense. Petitioner's accountant testified that many insurance premiums on personal policies were taken as expense deductions during the years in question. In this year, also, we have the pattern of charging and deducting capital expenditures as expenses. In one instance in 1946, although the amount is not large, we find a patent effort to conceal not only the nature of the expenditure but also an accompanying (though rather trifling) personal expense. A check was issued for $363.33 which was charged to decorating expense. The stub shows the payee to be C. C. Gray. The check was actually payable to Miller's, Inc., $310.08 representing the purchase of hotel equipment and $53.25 representing a personal expense. *143 In 1946, a check in the amount of $116.66 was paid for the purchase of a typewriter, but was charged to decorating. The bank deposits for 1946 exceeded the funds available for deposit per books in the amount of $3,978.02. We realize that the specific items discussed for 1946 are small, aggregating only about $900. Nevertheless, they are of the same general pattern as the frauds in the three prior years. Petitioner undoubtedly knew that premiums on personal insurance were not deductible. He did not take the stand to offer any mitigating or explanatory circumstances with respect to the particular charge and deduction, and likewise did not explain the deduction of other premiums on personal policies although, as we noted above, general reference to the fact of such deductions was made by his accountant. That he also realized it was improper to expense capital items (which he did a number of times during the years before us) is further emphasized by his efforts at concealment. The personal item included in the general check to Miller's, Inc., is, of course, trivial in amount but the effort to cover it (as well as the capital nature of the larger part of the payment) by showing the *144 wrong payee on the stub, and by including it in an over-all erroneous charge to an unrelated account cannot be wholly disregarded in the light of the numerous other petty efforts of petitioner to save a few tax dollars. In all events, we think respondent has again met his burden of proving that some part of the deficiency for 1946 was due to fraud with intent to evade taxes, and upon consideration of the 1946 circumstances in the setting of the entire record, we do not feel justified in brushing aside the proof as de minimis. Petitioner argues that we should not have received evidence of his conviction (upon plea of nolo contendere) of wilful attempt to defeat and evade income taxes for the years 1945 and 1946 in violation of section 145(b) of the Internal Revenue Code of 1939. Petitioner did not take the stand. He did, however, introduce the evidence of several witnesses as to his good character. Moreover, his tax returns and some of his books and records were offered in evidence on his behalf, and the credit to be given to them is significant not only on the question of whether or not his income was understated on his returns, but also on the issue of whether or not the use *145 of the net worth method was appropriate to the determination of understatements. We limit our consideration of this evidence to the question of the credit to be given to the returns, books, and records. As so limited, we think it is clearly admissible. We have in fact given no consideration to the plea or conviction thereon as a basis for inference of fraudulent intent. In those years in which we have found fraud, we were uninfluenced by that evidence, and our analysis and discussion, we think, establishes fraud without support from such conviction. As to the admissibility of the evidence on the question of the credit to be given to petitioner's returns, books and records, the Court of Appeals for the Third Circuit, in Paul Masters v. Commissioner, 243 Fed. (2d) 335 (C.A. 3, 1957) affirming 25 T.C. 1093, said, in part: "There is no valid distinction between a judgment of conviction based on a plea of 'nolo contendere' and such judgment entered after a plea of 'guilty.' The former is an attempted face saving process. A trial judge may at times consent to that procedure but when it is followed by judgment of conviction and sentence it merely provides *146 a surface language cloak which is completely removed by the judgment and sentence. That type of conviction is admissible evidence for impeachment purposes. * * *" After noting that the Tax Court is bound by rules of evidence applicable in the Courts of the District of Columbia, and that the District of Columbia statutes provide that the conviction of a crime may be given in evidence in said courts to affect credibility, the Court of Appeals reached its conclusion on the evidence question as follows: "While Masters did not personally take the stand, his sworn tax returns were in evidence as were his other records. The evidential credibility of those documents which actually amounted to Masters' individual evidential credibility was the predominant issue in this cause as far as he was concerned, just as much as if he had been sworn as a witness. Under the trial circumstances the acceptance of the record of his conviction was within the statute." [Italics supplied.] See also Lillian Kilpatrick, 22 T.C. 446 (1954), affirmed, 227 Fed. (2d) 240. Claim of Overpayment On January 6, 1954, petitioner paid to the district director of Internal Revenue, Nashville, *147 Tennessee, the amount of $26,953.40, which was the total of the deficiencies (without interest and exclusive of additions to tax under section 293(b)) determined by respondent in his statutory notice for the years 1941 to 1946, inclusive. Petitioner argues that if we hold that the deficiencies so determined are excessive, we must find an overpayment. The amount in question was paid by petitioner after the case was pending in this Court on his appeal from the statutory notice. While we have held that the statute of limitations applies to the years 1941 and 1942, and have made adjustments in other years, we have also held for the years 1943 to 1946, inclusive, that additions to tax under section 293(b) are to be applied. We have also held that the Current Tax Payment Act of 1943 is applicable. In all events, until computations are made in accordance with our Opinion under Rule 50, we will not be in a position to determine whether, and if so, to what extent, the payment of $26,953.40 may exceed the total deficiencies and additions to tax. We assume that in this, as in most cases, the parties will stipulate the Rule 50 computations, and at the same time stipulate the manner in which *148 the total payment of $26,953.40 is to be credited or possibly in part refunded. There appears to be no reason to consider the matter further in this Opinion. Decision will be entered to the effect that there are no deficiencies or additions to tax in Docket No. 44282. Decision will be entered for the petitioner Zora Mills in Docket No. 44283. Decision will be entered under Rule 50 with respect to petitioner B. E. Mills in Docket No. 44283. Footnotes
*. Income and Victory tax.↩
1. See Opinion, infra.↩